1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  1:11-cr-00384-NONE

12              Plaintiff,

13        v.                                ORDER DENYING DEFENDANT'S
                                            MOTION FOR COMPASSIONATE
14   ERIC BEAUCHAMP,                        RELEASE

15              Defendant.                  (Doc. No. 149)

16

17

18        Pending before the court is defendant Eric Beauchamp's motion for compassionate release

19   pursuant to 18 U.S.C. § 3582(c)(1)(A).  The motion is largely based on defendant's medical

20   condition and the risks allegedly posed to him by the ongoing coronavirus ("COVID-19")

21   pandemic.  (Doc. No. 149.)  For the reasons explained below, defendant's motion will be denied.

22                              **BACKGROUND**

23        On September 20, 2013, defendant Beauchamp entered a plea of guilty to Count 1 of a

24   Superseding Information in which he was charged with conspiracy to cultivate more than 50

25   marijuana plants in violation of 21 U.S.C. §§ 846 and 841(a)(1).  (Doc. Nos. 98 at 2; 100; 101.)

26   In the presentence report prepared in this case, defendant's offense conduct leading to his

27   conviction was described as follows.  (Doc. No. 103 (Presentence Report).)  In 1991, defendant

28   was sentenced to state prison for 25 years to life after he was convicted of murder and attempted

1

1    murder following his jury trial in the Los Angeles County Superior Court.  (*Id.* at 4.)  While

2    serving his prison sentence in Soledad State Prison, correctional officers recovered a cell phone

3    from defendant's cell that contained images and other evidence indicative of an operation to grow

4    marijuana.  (*Id.* at 4–5.)  While monitoring defendant's mail in prison, a correctional officer

5    intercepted a letter written by defendant corroborating the evidence obtained from his cell phone.

6    (*Id.* at 5.)  In that letter, defendant described his own participation in a "plot in Fresno" that was

7    "ramped up to harvest" in a few months:  "I did it all bro, research, procurement, design, etc. and

8    my farmer/partner has never seen shit grow so fast."  (*Id.*)  All the evidence discovered indicated

9    that defendant's marijuana grow operation was located at a specific address in Fresno, California.

10    (*Id.*)  Authorities executing a search warrant at that property recovered 75 live marijuana plants,

11    over 900 grams of processed marijuana, over 900 grams of marijuana leaf, and other evidence.

12    (*Id.*)

13        After his plea of guilty was entered in this case, it was determined that under the U.S.

14    Sentencing Guidelines defendant Beauchamp's adjusted offense level was 17 and his criminal

15    history placed him in category III, resulting in an advisory sentencing guideline range calling for

16    a term of imprisonment of between 30 and 37 months.  (*Id.* at 18.)  The U.S. Probation Office

17    recommended a sentence of 30 months.  (*Id.*)  On March 10, 2014, the court sentenced defendant

18    to a below-guideline sentence of 24 months in prison, with that federal term to run consecutive to

19    the state prison sentence defendant was serving at that time, with a 36-month term of supervised

20    release to follow.  (Doc. Nos. 120; 121 at 2–3.)  On July 11, 2019, defendant was released from

21    state custody after he was granted parole by the California Board of Parole Hearings.  (Doc. No.

22    149-3 at 2–3.)  Thereafter, on July 23, 2019, defendant was transferred into federal custody and

23    began serving the consecutive 24-month sentence imposed in this federal case.  (Doc. No. 149-2

24    at 4.)

25        Defendant is currently serving his federal sentence at the U.S. Bureau of Prisons' ("BOP")

26    Lompoc Federal Correctional Institution in Lompoc, California ("FCI Lompoc").  (Doc. No. 149

27    at 6.)  Defendant Beauchamp's projected release date from BOP custody is March 31, 2021.  *Find*

28    *an inmate.*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Nov. 22,

1    2020).  On September 1, 2020, defendant filed the pending motion for compassionate release

2    pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 149.)  On October 5, 2020, the government

3    filed its opposition to the motion, and on October 19, 2020, defendant filed his reply thereto.

4    (Doc. Nos. 158, 162.)

5                                          **LEGAL STANDARD**

6            A court generally "may not modify a term of imprisonment once it has been imposed."  18

7    U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

8    conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

9    be modified by a district court except in limited circumstances.").  Those limited circumstances

10   include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp.

11   3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"),

12   motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A)

13   (2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for

14   compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the

15   FSA specifically provides that a court may

16              upon motion of the defendant after the defendant has fully exhausted
                all administrative rights to appeal a failure of the [BOP] to bring a
17              motion on the defendant's behalf[1] or the lapse of 30 days from the
                receipt of such a request by the warden of the defendant's facility,
18              whichever is earlier, may reduce the term of imprisonment (and may
                impose a term of probation or supervised release with or without
19              conditions that does not exceed the unserved portion of the original
                term of imprisonment), after considering the factors set forth in [18
20              U.S.C. §] 3553(a) to the extent that they are applicable, if it finds
                that –
21
22              (i)      extraordinary and compelling reasons warrant such a
                         reduction; or
23

24   [1]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the
     defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the
25   date the Warden signed the response." 28 C.F.R. § 542.15(a).  If the Regional Director denies a
     defendant's administrative appeal, the defendant must appeal again to the BOP's "General
26   Counsel within 30 calendar days of the date the Regional Director signed." *Id.*  "Appeal to the
     General Counsel is the final administrative appeal." *Id.*  When the final administrative appeal is
27   resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C.
     § 3582(c)(1)(A).
28

                                                     3

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

  The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[3]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts

---

[2] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[3] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

4

1  "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even

2  though that policy statement was issued before Congress passed the FSA and authorized

3  defendants to file compassionate release motions).  However, a large and growing number of

4  district courts across the country have concluded that because the Sentencing Commission has not

5  amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA

6  categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling

7  circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c).  *See,*

8  *e.g.*, *United States v. Parker*, 461 F. Supp.3d 966, 978–79 (C.D. Cal. 2020) (collecting cases);

9  *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

10        In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

11  defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

12  *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

13  has not specifically addressed the question of which party bears the burden in the context of a

14  motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

15  that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

16  *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020);

17  *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7,

18  2020).

19                                                        **ANALYSIS**

20        As district courts have summarized, in analyzing whether a defendant is entitled to

21  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

22  defendant has satisfied three requirements:

23              First, as a threshold matter, the statute requires defendants to exhaust
              administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a
24              district court may grant compassionate release only if "extraordinary
              and compelling reasons warrant such a reduction" and "that such
25              reduction is consistent with applicable policy statements issued by
              the Sentencing Commission.  *Id.*  Third, the district court must also
26              consider "the factors set forth in Section 3553(a) to the extent that
              they are applicable."  *Id.*

27

28  *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp.3d at 973–74;

*United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

"consistent with" the sentencing factors set forth in §3553(a)).

**A.    Administrative Exhaustion**

On May 25, 2020, defendant submitted an administrative request to the Warden at FCI

Lompoc seeking compassionate release based on his medical conditions.  (Doc. No. 149-21 at 2.)

Defendant then followed up on his request the next day, on June 10, 2020, and then a final time

on June 12, 2020.  (*Id.* at 3–5.)  Defendant asserts that "[a]s of August 17, 2020," he had not

received a response from the Warden.  (Doc. No. 149 at 20.)  The government concedes that

defendant has exhausted his administrative remedies.  (Doc. No. 158 at 10.)  The court concludes

that defendant exhausted his administrative remedies because he filed the pending motion for

compassionate release after submitting a request to the Warden and waiting more than 30 days

without receiving a response.  Moreover, because a failure to exhaust administrative remedies

where such is required is normally viewed as an affirmative defense, the government's

concession on this point will be accepted.  Therefore, the court will address the merits of

defendant's motion.

**B.    Extraordinary and Compelling Reasons**

"Extraordinary and compelling reasons" warranting compassionate release may exist

based on a defendant's medical conditions, age and other related factors, family circumstances, or

"other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other

reasons" was included in the policy statement at a time when only BOP could bring a

compassionate release motion, courts have agreed that it may be relied upon by defendants

bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-

JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

Thus, the medical condition of a defendant may warrant compassionate release where he

or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

examples of terminal illnesses that may warrant a compassionate release "include metastatic

solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced

dementia." *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental

condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of
> the aging process,
>
> that substantially diminishes the ability of the defendant to provide
> self-care within the environment of a correctional facility and from
> which he or she is not expected to recover.

*Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

be sufficient to warrant compassionate release under ordinary circumstances, some courts have

concluded that the risks posed by COVID-19 tips the scale in favor of release in particular

situations.  *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020)

("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's

health problems, proximity to his release date, and rehabilitation would not present extraordinary

and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his

sentence.").

Compassionate release may also be warranted based on a defendant's age and other

related factors.  In these situations, "extraordinary and compelling reasons" exist where a

"defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of

his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[4]  In

---

[4]  Because defendant Beauchamp is only 52 years old, (*see* Doc. No. 103 (Presentence Report) at 2), these age and age-related factors are irrelevant to the court's disposition of the pending motion.

1    determining a defendant's projected release date, courts may take into account any "good time

2    credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18

3    U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal.

4    Apr. 10, 2020).

5          Here, defendant Beauchamp argues that extraordinary and compelling reasons warranting

6    his compassionate release exist due to his medical condition.  To qualify for compassionate

7    release, defendant must show that he is suffering from some "serious" medical condition "that

8    substantially diminishes [his] ability . . . to provide self-care" in FCI Lompoc and the medical

9    condition is one "from which he . . . is not expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1

10   (A)(ii).  In support of his application, defendant cites his purported moderate-to-severe asthma

11   condition, the fact he is overweight, his age, his iron deficiency, and the associated risks of

12   COVID-19 to him because of those medical conditions.  (Doc. No. 149 at 20–21.)

13         At the outset, a discussion regarding defendant's asthma condition is warranted.

14   According to defendant's BOP medical records generated in September 2020, he currently suffers

15   from the following conditions:  iron deficiency anemia, migraines, "exercise induced" asthma,

16   and "[u]nspecified abnormalities of breathing."  (Doc. Nos. 161 at 2 (sealed); *see also* 154 at 20

17   (sealed: generated in July 2020).)  Defendant's first two conditions were diagnosed before the

18   onset of the COVID-19 pandemic, and the latter two medical conditions were officially diagnosed

19   by the BOP medical staff in late June 2020.  (Doc. No. 161 at 2 (sealed).)  Even though his

20   diagnosis was not documented until just a few months ago, it appears defendant Beauchamp has

21   suffered from some form of asthma for an extended period of time.  Defendant's BOP medical

22   records provide the following description regarding his asthma condition:  "juvenile onset asthma

23   which he states was aggravated growing up in late 60's in Los Angeles due to his exposure to

24   SMOG.  No reported hospitalizations, nor ED visits for his asthma."  (*Id.* at 3.)  To treat this

25   condition, defendant has been prescribed an albuterol inhaler by the BOP's medical staff.  (Doc.

26   No. 154 at 17 (sealed).)  The BOP has instructed him not to use the inhaler daily, but rather "as

27   needed to prevent/relieve asthma attack[s]."  (*Id.*)  On August 4, 2020, a BOP medical staff

28   member noted that defendant's respiratory system was showing no signs of distress, "good

1   excursions," and "[n]o wheezing." (Doc. No. 161 at 4 (sealed).)

2          When the U.S. Probation Office conducted its presentence investigation interview of

3   defendant, he reported several physical injuries at that time, including bruised ribs, a shoulder

4   injury, and a knee injury, that were the result of being struck by a vehicle and alleged assaults by

5   correctional officers. (Doc. No. 103 (Presentence Report) at 12.) Defendant also reported that he

6   suffered from migraine headaches. (*Id.*) He did not report suffering from any other physical

7   conditions at that time. (*Id.*) However, as defendant explains in his declaration submitted with

8   his reply brief in support of his pending motion, during his presentence investigation interview

9   conducted in this case, he "was not specifically asked whether [he] had asthma or any breathing

10  condition[.]" (Doc. No. 162-2 ¶ 1.) He states that he only remembers the questioning by the

11  probation officer pertaining to physical injuries, as opposed to physical condition more generally.

12  (*Id.*) Defendant further explains that he had difficulties in concentrating during the probation

13  interview because he had a migraine at the time, was dehydrated, and was shackled since the

14  early morning that day. (*Id.*) Now, in his declaration submitted in support of the pending motion,

15  defendant states that he has "lived with chronic, moderate-to-severe asthma [his] whole life." (*Id.*

16  ¶ 2.) The court finds defendant's detailed declaration to be essentially credible and concludes that

17  he did suffer from asthma prior to June 2020 and was only recently diagnosed as suffering from

18  that condition likely because of his recent transfer into federal custody. (*See id.* at ¶¶ 3, 5–6, 8–14

19  (explaining that medical staff at FCI Lompoc told defendant in March 2020 to "be patient"

20  several times because they were "only dealing with COVID-19 now").)

21         Nonetheless, the court is not persuaded that defendant currently suffers from even

22  moderate asthma. Generally speaking, there are four types of asthma classifications: mild

23  intermittent, mild persistent, moderate persistent, and severe persistent. *Adult-Onset Asthma*,

24  WEBMD, https://www.webmd.com/asthma/guide/adult-onset-asthma (last visited Nov. 22, 2020).

25  Individuals suffering from symptoms less than twice a week likely suffer from mild intermittent

26  asthma, whereas individuals suffering from symptoms approximately three to six times a week

27  likely suffer from mild persistent asthma. *Id.* Individuals who suffer from moderate persistent

28  asthma (a moderate-intermittent-asthma category does not exist) display symptoms daily,

1   sometimes lasting for days.  *Id.*  Additionally, "[t]here is a reduction in lung function, with a lung

2   function test range above 60% but below 80% of normal values" for those suffering from

3   moderate persistent asthma.  *Id.*  After reviewing the medical evidence submitted in connection

4   with the pending motion, it does not appear that defendant suffers from moderate asthma.

5   Notably, his prescription for an inhaler explicitly notes that it should not be used daily, but only

6   should be used to prevent asthma attacks.  (Doc. No. 154 at 17 (sealed).)  Further, defendant's

7   respiratory system was recently documented by BOP medical staff as showing no signs of

8   distress.  (Doc. No. 161 at 4 (sealed).)  Last, the court notes that defendant's asthma condition is

9   not induced by day-to-day activities (e.g., walking), but rather only by exercise.  (Doc. Nos. 161

10   at 2 (sealed).)  Accordingly, the court concludes that defendant suffers from mild—not moderate

11   or severe—asthma.

12          The court acknowledges that defendant is overweight.  He is 6'2" and weighs, according

13   to the most recent records from January 2020, 230 pounds.  (Doc. No. 154 at 37 (sealed).)  As a

14   result, defendant's body mass index (BMI) is 29.5 placing him in the overweight category, just

15   shy of being obese.  *Adult BMI Calculator*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

16   https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcula

17   cal.html (last visited Nov. 22, 2020).

18          Therefore, according to the U.S. Centers for Disease Control and Prevention ("CDC"),

19   defendant "might be at an increased risk for severe illness from" COVID-19 based on the fact that

20   he is overweight.  *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased*

21   *Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

22   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-

23   risk.html (last visited Nov. 22, 2020).  Defendant may be at greater risk of suffering severe illness

24   were he to contract COVID-19 because of his age at 52 years old, but that risk is relative to the

25   risk facing a 40-year old, as the CDC explains more generally:  "As you get older, your risk for

26   severe illness from COVID-19 increases."  *Id.*  Further, defendant is not at higher risk of severe

27   illness based on his asthma condition because he suffers from mild asthma and the CDC only

28   recognizes "moderate-to-severe" asthma as a potential at-risk category.  *Id.* (explaining those

1    suffering from moderate-to-severe asthma "might be at an increased risk" but not identifying mild

2    asthma as an at-risk condition).  Finally, the court was unable to locate any guidance from the

3    CDC regarding whether an iron deficiency can put an individual at greater risk from becoming

4    severely ill as a result of contracting COVID-19.  *See passim id.*  Defendant provides some

5    authority, not from the CDC, indicating that there may be a "correlate[ion]" between those

6    suffering from iron deficiency and the severity of their illness after contracting COVID-19,

7    however those articles do not appear to assert that an iron deficiency can actually *cause* a severe

8    illness if COVID-19 is contracted.  (*See* Doc. No. 162 at 15 ("The June 2020 article described

9    how the immune response to COVID-19 could restrict iron availability resulting in anemia.").

10   Nonetheless, defendant does suffers from at least one comorbidity.

11           However, based upon the evidence currently before the court, defendant Beauchamp's risk

12   of suffering a severe illness by contracting COVID-19 is speculative.  This is because on April 1,

13   2020, defendant tested positive for COVID-19, but was listed as an "asymptomatic person in

14   quarantine."  (Doc. No. 161 at 2 (sealed).)  On June 26, 2020—nearly three months after testing

15   positive for COVID-19—the BOP's medical staff noted that defendant appeared "[w]ell, [a]lert

16   and [o]rientated."  (Doc. No. 154 at 6 (sealed).)  On August 3, 2020—over four months after

17   testing positive for COVID-19—the result of a pulse-oximetry test showed defendant's oxygen

18   saturation was at 97%.  (Doc. No. 161 at 3 (sealed).)  It appears that defendant did not suffer from

19   any major COVID-19 symptoms, and the evidence regarding his current health shows that he is

20   doing relatively well, all things considered.  Thus, it does not appear that defendant suffered from

21   any serious illness, and perhaps not even a mild one, after contracting the COVID-19 virus.  *See*

22   *Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19*

23   *in Healthcare Settings (Interim Guidance)*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

24   https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html (last

25   visited Nov. 22, 2020) (stating that those with a "moderate illness" typically have an oxygen

26   saturation level of about 94%, and those with a "mild illness" generally display multiple

27   symptoms, including, for example, a fever, cough, sore throat, headache, and muscle pain).

28   /////

1    Defendant suggests that the possibility of his re-infection with the virus weighs in favor of

2    his compassionate release.  (*See* Doc. No. 162 at 15–16.)  In this regard, many courts have

3    "err[ed] on the side of caution to avoid potentially lethal consequences" because "the science is

4    unclear on whether reinfection is possible."  *United States v. Yellin*, No. 3:15-cr-3181-BTM-1,

5    2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020) (finding extraordinary and compelling

6    reasons exist where a COVID-positive inmate at FCI Terminal Island, who did not develop severe

7    symptoms, suffered from a combination of medical conditions that placed him at risk of serious

8    complications from COVID); *see also United States v. Hanson*, No. 6:13-cr-00378-AA-1, 2020

9    WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no current scientific evidence to indicate

10   that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently

11   acknowledged. . . . [T]he Court remains concerned about FCI Terminal Island's ability to provide

12   adequate care in light of defendant's complex medical needs.  The Court is not convinced that

13   FCI Terminal Island has been successfully mitigating the risk of reinfection, given the high

14   numbers of infected inmates and Defendant's own contraction of the virus.").  Other courts have

15   taken the position that uncertainty surrounding the danger of reinfection "cuts against

16   compassionate release," in part because it is the defendant's burden to establish that

17   "extraordinary and compelling reasons" justifying compassionate release exist.  *See United States*

18   *v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020).

19   Even if the court assumed that there was a possibility of defendant being reinfected, that

20   speculative risk combined with his age, BMI, and mild asthma condition are not a sufficient basis

21   upon which to conclude that he suffers from a "serious" medical condition for purposes of

22   compassionate release.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Defendant has not cited the

23   court to any case in which compassionate release has been granted to an inmate who is in the

24   same or similar physical condition as defendant Beauchamp currently is.  In addition, there is no

25   evidence before the court that defendant's purported medical conditions "substantially diminish[]

26   [his] ability . . . to provide self-care" in FCI Lompoc.  *See id.*  It is true that FCI Lompoc suffered

27   from a significant COVID-19 outbreak earlier this year, with 702 inmates and 19 staff reported by

28   the BOP as having tested positive for the virus and since having recovered, while two inmates at

12

1    that prison died at the hands of the virus.  *See* COVID-19, FEDERAL BUREAU OF PRISONS,

2    https://www.bop.gov/coronavirus/ last visited Nov. 22, 2020).[5]  At this time, however, there are

3    currently zero inmates and zero staff at FCI Lompoc who are being reported by the BOP as

4    having active cases of COVID-19.[6]  *Id.*  Because it appears that the current active cases of the

5    virus among prisoners at FCI Lompoc have been reduced to zero, adding COVID-19 to the

6    equation does not tip the scales in favor of defendant's compassionate release.  As discussed

7    above, nothing in the record suggests that defendant is struggling to care for himself while

8    imprisoned at FCI Lompoc.  Indeed, defendant appears to be doing "[w]ell," even after having

9    contracted COVID-19.  (Doc. No. 154 at 6 (sealed).)  Accordingly, while there is still some

10    unknown risk to defendant due to the possibility that he could be reinfected with COVID-19, that

11    speculative possibility provides no basis upon which the court could conclude that defendant is

12    "substantially diminishe[d]" in his ability to "provide self-care" at FCI Lompoc.  *See* U.S.S.G.

13    § 1B1.13, cmt. n.1 (A)(ii).  Thus, defendant Beauchamp has failed to carry his burden in this

14    regard.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the initial burden to put

15    forward evidence that establishes an entitlement to a sentence reduction.").

16        Therefore, the court does not find extraordinary and compelling reasons justifying

17    compassionate release pursuant to § 3582(c)(1)(A) in this case.

18    **C.**      **Consistency With the § 3553(a) Factors**

19        Because the pending motion fails to establish extraordinary and compelling reasons

20    justifying compassionate release in this case, the court need not address whether any reduction in

21    defendant's sentence would be consistent with consideration of the sentencing factors set forth at

22    18 U.S.C. § 3553(a).  The court does note, however, that defendant received a below guideline

23    /////

24

25    [5]  FCI Lompoc has a population of 945 inmates.  *FCI Lompoc*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/lof/ (last visited Nov. 22, 2020).

26

27    [6]  While the undersigned does not necessarily accept these reported numbers at face value in light of current CDC guidelines with respect to both testing and the manner of counting "active cases" without requiring retesting before counting one has having "recovered," there is also no evidence

28    before the court challenging those reported numbers in this case.

sentence in this case in which he planned and orchestrated a marijuana grow operation from state prison while serving a sentence imposed by the state court.

## CONCLUSION

For the reasons explained above, defendant's motion for compassionate release (Doc. No. 149) is denied.

IT IS SO ORDERED.

Dated:   **November 22, 2020**

_____
UNITED STATES DISTRICT JUDGE

14